GRIFFIN, Judge.
This is an appeal of a jury verdict rendered against Wet ’n Wild Florida, Inc. (“Wet ’N Wild”) in an action for negligence brought by Deborah Sullivan (“Sullivan”).
Sullivan injured her back while pulling a young black woman (“the victim”), whom Sullivan believed was in danger of drowning, from the “wave pool” at Wet ’n Wild. Sullivan later underwent back surgery and then brought an action for negligence against Wet ’N Wild. The amended complaint alleged that employees of Wet ’N Wild had negligently failed to rescue the victim, who was in imminent danger of drowning, and that because of their negligence, Sullivan had been required to rescue her, resulting in injuries to her. Wet ’N Wild asserted that it had not breached any duty owed to Sullivan, that Sullivan was herself negligent and that the victim was negligent.
At trial, Sullivan testified that on the day of the accident she had taken her daughter and several friends to Wet ’N Wild. She was standing by the wave pool around 4:30 p.m. when the wave machine was turned on. As Sullivan looked on, the first of the waves tipped over a raft on which several girls were *1173 sitting. Sullivan watched as the victim, who was one of the girls on the raft, “start[ed] doggie paddling and [she] thought, she shouldn’t be in this wave pool, she can’t swim.” Although the victim was only in two and a half feet of water, Sullivan said the victim was unable to surface when she got caught underneath the raft. As Sullivan screamed for help, the victim “bucked” underneath the raft but was still unable to surface, either because of the crowd or the waves, because she couldn’t swim, or because she was caught underneath the raft. Sullivan claimed that she was standing fifteen to twenty feet from a lifeguard station, but that when she glanced over, the station was empty. She continued to scream for help, but after a goodly amount of time had elapsed, and the victim still had not surfaced, she threw down her money and cigarettes and jumped in the water. She then shoved her way over to the victim, who weighed almost two hundred pounds, and “jerked her” off of the bottom. At this point, Sullivan claims the victim was “lifeless.” Sullivan was not joined by a lifeguard until after she had moved the victim about three feet. The two of them then dragged the victim until she was almost out of the water, where they were joined by other lifeguards. The victim walked to first aid and there is no evidence she suffered injury.
When asked how much time had elapsed between the time the victim fell off the raft and the point at which she jumped in the water, Sullivan testified:
I would say at least five minutes. It had to be because I kept screaming and screaming. And I had already looked for the lifeguard, I had already hit this guy. She had went through all these motions to try to bring herself up and was all the way over there, and I knew that there was no more time I could wait. I had to jump in and do it myself.
She later amended this testimony, stating:
The only thing I know is that there is no way it could have been less than two to three minutes because there was so much screaming and so many things that took place that would have naturally had to take time, and I didn’t want to panic. The thing was, I wanted to get somebody close to her because she was moving away from me. And I thought, even if I jump, she has a better chance of someone close to her lifting down and picking her up or getting her above water. So I — in fact, I thought that I had took actually a little bit too much time before I done something myself.
As part of her case, Sullivan offered the deposition testimony of John Fletemeyer, the head supervisor of beaches of the Palm Beach Police Department. Fletemeyer testified that Wet ’N Wild utilized the Ellis Associates procedures for lifeguards at their theme parks. Under this procedure, the lifeguard is expected to scan his zone in ten seconds, to identify any problem and to respond within twenty seconds. Fletemeyer opined that in this case the lifeguard simply missed the rescue, based in part on Sullivan’s testimony concerning the time frame when she saw the victim and the time when the lifeguard responded. Fletemeyer further testified that the lifeguard used an improper procedure in dragging the victim from the water and in failing to properly complete a written report detailing the incident by not including Sullivan’s name. According to Fle-temeyer, these things reflected negatively on Wet ’N Wild’s “overall ability to operate in a professional way.” Over objection, the court also permitted Fletemeyer to testify that certain identifiable groups of persons, including blacks, are more prone to drowning, so that lifeguards should be extra “sensitive” to then-needs and watch them more closely. During this testimony, Fletemeyer relied in part on a study conducted by a professor in Georgia, stating:
A. For many years I never quite understood it, but very recently a gentleman in Georgia, a professor, did a study, he is a black man himself, looking at certain anatomical characteristics of the black population. And he has found out what we have thought all along, is that blacks have different muscle densities.
Q. How about swimming, do black people swim?
A. They do, and this is something that I’m beginning to study and I’m applying *1174 for a grant as we speak on the subject. Because of certain social cultural experiences, black people don’t have, there are always exceptions but most black people don’t have the opportunity to learn to swim as white people do. It costs money to go to the YMCA and take swimming lessons. And because of social economic reasons, they don’t have the opportunity, and that is probably another reason why more black people drown than white people.
We reverse and remand for a new trial because we conclude that it was error not to submit the issue of the victim’s negligence to the jury’s consideration. The trial court directed a verdict on Wet ’N Wild’s defense that the victim was negligent based on Sullivan’s argument there was no evidence of negligence:
What we have here requires this jury to speculate that this child was either a poor swimmer; maybe they will speculate she ate too big a lunch; speculate that being fat caused her not to be able to swim, I don’t know. But he has not produced one piece of evidence that this child was unreasonable, careless or negligent in getting in this pool. Nothing.
Even Wet ’N Wild’s corporate representative has not said, well, we have signs up there that say, if you’re a poor swimmer do not enter the wave pool. They haven’t testified that they have anything that prevents any child from entering this pool.
They have testified that we have a policy that children cannot enter the pool without their parents. So what he’s going to ask this jury to do is say this 13 or 14 year old child was negligent. Based on what? The fact that she got in trouble. That and that alone?
We agree with Wet ’N Wild that there was evidence from which the jury could infer that the victim was responsible, at least in part, for her own peril and the rescue that was necessitated because she had placed herself in peril. Sullivan contends that even assuming arguendo that her own testimony is sufficient to establish that the victim was a weak swimmer, there was still no evidence of any negligence on the part of the victim because persons who cannot swim are not barred from the wave pool; rather, the evidence showed only that Wet ’N Wild warned weak swimmers to move to the shallow end of the pool before the wave machine is turned on. Sullivan further contends that the evidence suggests that the young woman complied with these instructions because the accident occurred in two and a half feet of water.
Sullivan also testified, however, that the water in which the accident happened was sometimes head deep. On redirect by her own counsel, she testified:
Q. All right. Now, you mentioned this water was waist deep. How about the waves. How high were they?
A. I would estimate that they go up about two to three feet.
Q. Okay. So the water could vary from waist deep to head deep?
A. Yes, sir.
Even though Wet ’N Wild did not bar non-swimmers from the wave pool, this testimony, coupled with Sullivan’s testimony that, based on her observations, the victim could not swim, and had gotten herself caught under the raft, is sufficient to create a jury question on whether she acted reasonably for her own safety or whether the victim’s own negligence placed her in peril. Under the principles of Messmer[1] and Fabre,[2] based on Sullivan’s own testimony about her observations of the victim, the jury should have been allowed to consider the question of the negligence of the victim, as well as that of Wet ’N Wild, and apportion, if appropriate, the relative fault in causing Sullivan’s injury.
We also agree with Wet ’N Wild that the trial court improperly admitted Fletem-eyer’s deposition testimony that blacks are more prone to drowning, so that lifeguards should be extra “sensitive” to them needs. When Sullivan sought to introduce this testimony, defense counsel objected that Fletem-eyer had testified that the study was “recent”, and he suggested that “recent” studies *1175 could have no effect on lifesaving techniques in effect as of the incident. He further suggested that there was no reason to inquire “into what somebody in Georgia did.” Imprecise as this objection is, it appears to us correct that this testimony had no bearing on the issue presented in the case, which was whether Wet ’N Wild’s lifeguarding on the date and time in question fell below the generally accepted standard of care. Even if studies are underway in Georgia or in West Palm Beach concerning reasons for the incidence of drowning among blacks, nothing in the record suggests that the generally accepted lifeguarding techniques employed by Wet ’N Wild that he testified to were inadequate.
Finally, we agree the trial court erred in admitting Fletemeyer’s deposition testimony that, in his opinion, the lifeguard used improper procedures in dragging the victim from the water and in failing to complete a written report detailing the incident which included Sullivan’s name. According to Fle-temeyer, these failures suggest Wet ’N Wild did not have the “overall ability to operate in a professional way.” Again, we begin with the question whether the objection made in the trial court was sufficiently specific to preserve this issue for review. Wet ’N Wild objected to this testimony below on the following grounds:
The problem with those questions and those answers, Your Honor, is he’s expressing opinion [sic] about the fact that Miss Sullivan’s name did not appear on an accident report. How that interacts, I have no idea, with his opinion that Wet ’N Wild violated a standard. There is no standard that requires you to list people as witnesses on accident reports. That is not an opinion testimony for him as an expert. He’s just throwing that in, oh, by the way, I don’t think they ran a good ship because, gee, they didn’t have her name on the accident report.
Wet ’N Wild appears to be correct that Fle-temeyer’s testimony concerning acts of negligence apart from the failure to timely rescue the victim should have been excluded. The sole purpose behind the introduction of this testimony, as Wet ’N Wild points out, was to create the inference that if Wet ’N Wild was negligent in general, it was probably negligent with respect to this accident. However, this evidence was irrelevant since it had no tendency to prove or disprove that Wet ’N Wild was negligent in failing to observe the victim’s peril and timely rescue her. On appeal, Sullivan contends this testimony was harmless but it is impossible to tell. Plaintiffs counsel evidently thought it was of value to his case or he would not have insisted on its admission.
REVERSED and REMANDED.
THOMPSON, J., and ANTOON, Associate Judge, concur.

. Messmer v. Teacher’s Ins. Co., 588 So.2d 610 (Fla. 5th DCA 1991), review denied, 598 So.2d 77 (Fla. 1992).

. Fabre v. Marin, 623 So.2d 1182 (Fla.1993).